**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**ALLIE L. PORTER, III,**                    )
                                             )
                      Plaintiff,             )
                                             )
          v.                                 )          Civil Action No. 05-231 Erie
                                             )
**THOMAS E. GRAY,**                          )
                                             )
                      Defendants.            )

<u>**MEMORANDUM OPINION**</u>

McLAUGHLIN, SEAN J., District J.,

On December 24, 2003, Plaintiff Allie L. Porter, III was arrested for arson and

related charges stemming from a fire which severely damaged his property.  Porter has

filed this action under 42 U.S.C. § 1983[1] against the lead investigating and arresting

officer, Detective Thomas E. Gray, alleging that the arrest was without probable cause

and racially motivated.  We have jurisdiction pursuant to 28 U.S.C. §§ 1331 and

1343(a)(3).

Presently pending before the Court is a motion by the Defendant for summary

judgment.  For the reasons set forth herein, the motion will be granted.

## I.  BACKGROUND FACTS [2]

Plaintiff, an African-American male, is the owner of a single family residence

located at 2213 East 18th Street, in the City of Erie (hereinafter, the "Property").  Plaintiff

formerly shared the residence with Tammie Porter, then his wife.  Sometime prior to

---

[1] Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress..."  42 U.S.C. § 1983.

[2] Unless otherwise indicated, these background facts are not disputed.

Thanksgiving of 2001, Plaintiff and Tammie separated.  (Doc. # 25-2; 30-6, p. 16.)  For awhile thereafter, Plaintiff continued to reside at the Property with his son, Allie Porter IV.  (Doc. # 30-6 at pp. 18-19.)

In or around January of 2002, Plaintiff's girlfriend, Chaka Sparks, gave birth to a baby girl fathered by Plaintiff.  (Doc. # 30-6, pp. 16-19, 27.)  Around that time, Plaintiff and his son moved out of the Property and into the home of Ms. Sparks.  (Id.)  At some point, Plaintiff's elder daughter, Crystal Porter, then 19 years of age, moved into the Property and resided there.  (Id. at pp.18-19; # 30-2, pp. 2, 5.)  Plaintiff would frequently stop by the Property and continued to assume responsibility for the mortgage payments.  (Doc. # 30-6 at pp. 19-20, 24; # 30-2, pp. 2, 4-5.)  The utility bills also continued to be in his name.  (Doc. # 30-6 at pp. 23, 27.)

In February of 2003, Crystal Porter was the victim of a drug related shooting which occurred at the Property.  Reportedly, several Dominican individuals had forced their way into the house and shot Crystal in her right thigh over an incident involving stolen drugs.  Following the shooting, Crystal did not reside at the Property out of fear for her own safety. (Doc. # 30-2, p. 8.)

On the morning of March 5, 2003, a fire occurred at the Property, which resulted in extensive damage to Plaintiff's house and minor damage to the adjacent residence. The first person on the scene was a witness working nearby in the neighborhood. Believing the residence might be occupied, the witness kicked in the front door, only to find that he could not safely enter the house due to heavy smoke and flames.  In fact, the house was unoccupied at the time and, according to the complaint, no one had been living there for several months.  (See First Amended Complaint ¶ 11.)

The Erie Fire Department was called to the scene at approximately 6:46 a.m. and, upon arrival, began to extinguish the fire.  After the fire was put out, members from the Erie Fire Investigation Unit were called in to investigate the cause and origin of the fire.  Plaintiff, who had arrived on the scene at approximately 7:10 a.m., was interviewed by Lt. Richard Sadlier of the EFD and stated that he had been at work at

the time the fire was reported.  According to Lt. Sadlier's report, Plaintiff stated that he had been by the Property at approximately 5:30 a.m. that morning to check on a dog that was being kept in the rear yard for security purposes.  (Doc. # 25-22; 25-37; 30-6 at pp. 40-41.)  He further stated that only he and his daughter had keys to the residence and that he had secured the residence earlier that night.[3]

A criminal investigation was undertaken on behalf of the Erie Police Department by Defendant Gray, a detective certified as a fire inspector and specializing in property crimes.  Plaintiff was interviewed by Detective Gray at the scene of the fire and stated that he had last been inside the house at about 10:00 p.m. the night before the fire, for about 15 minutes, to drop off some clothes.  He also mentioned that he had two dogs which he had removed from the Property at that time.  Detective Gray also spoke with Plaintiff's father, who advised Gray that "the Dominicans" were reportedly back in town and may have set the fire.  Plaintiff's father did not know whom he had heard this rumor from but indicated that he would check it out. (Doc. # 30-5, pp. 36-37.)

Because Plaintiff subsequently submitted a claim for fire-related property damage to his insurance company, a third investigation into the cause and origin of the fire was commenced by the insurance company's fire investigation specialist, W. Brian Wydra.  Collectively, the investigations revealed that, at the time of the fire, the house windows and doors were secure, except for the front door which had been kicked in by the independent witness.  There were otherwise no signs of forced entry into the house. The investigators concluded that the fire had been deliberately set with gasoline used as an accelerant, and it appeared to have originated in the kitchen and rear bedroom

---

[3] Although Defendant cites to Lt. Sadlier's Fire Investigation Report (see Def.'s Br. in Supp. of Mot. for Summ. Judg. [Doc. # 23, p. 4.), we have been unable to locate the document in the record. Nevertheless, there does not appear to be any disagreement among the parties with respect to the Defendant's representation as to the contents of Lt. Sadlier's report.

3

area of the house.[4]  Given the circumstances, Detective Gray believed that a delay

device had been used to set the fire, although no evidence was found to confirm what

type of device might have been used.

As part of his private investigation, Mr. Wydra interviewed Plaintiff on March 15,

2003.  Mr. Wydra recounted the substance of that interview as follows:

> When asked to describe the events that led up to the fire at his house, Mr.
> Porter stated that approximately one or two weeks before the fire
> someone had shot his daughter while she was in the house located at
> 2213 East 18th Street.  I asked Mr. Porter the age and name of his
> daughter.  Mr. Porter stated that his daughter's name was Chrystl [sic]
> Porter and that she was 19 years old.
>
> When I asked Mr. Porter to describe the shooting, he stated that his first
> cousin, Adrena [sic] Logan, approximately 32 to 33 years old, came to
> visit his daughter.  At the same time, three men he described as
> Dominicans forced their way into his house.  They shot his daughter once
> in the thigh area of her right leg.  When I asked Mr. Porter what they shot
> his daughter with, he stated that they shot her with a pistol.  Mr. Porter
> went on to say that she was okay and, in fact, she was in his pickup truck
> and pointed to the truck.
>
> I then asked Mr. Porter if his daughter knew who shot her and if she could
> identify the three Dominicans.  He stated that she did not know them.  I
> asked Mr. Porter what motive the Dominicans had to shoot his daughter.
> Mr. Porter stated that his daughter had taken two black males to buy
> cocaine somewhere in Erie.  Then, supposedly the two black males that
> she was with had stolen two or three kilos of cocaine from some
> Dominicans.

(Doc. # 26-5, pp. 7-8.)

Plaintiff informed Mr. Wydra that he had spent the night before the fire at his

girlfriend's house and that he had left her house around 12:30 a.m. on March 5 when

the couple took their 14 month-old daughter to Hamot Medical Center.  According to the

report, Plaintiff admitted to driving by the Property at about 2:30 a.m. before returning to

his girlfriend's house.  He claimed that he left his girlfriend's house again to go to work

at about 6:50 a.m. and arrived at work at 6:57 a.m..  He stated that he had locked the

---

[4] Additionally, investigators observed that the heating registers were packed with dryer sheets.
Based on his training and experience, Detective Gray felt this was unusual and possibly a means of
transmitting a fire through a room without leaving a lot of evidence.  When interviewed by Mr. Wydra,
Plaintiff stated that his daughter has stuffed scented dryer sheets into the air ducts to make the house
smell better after the dog had defecated in the house.  (See Doc. # 26-5 at p. 4.)

house the night before the fire and that he and Crystal had each had keys to the house but that he had taken her key away from her.  (Doc. # 26-5, pp. 7-8.)

In connection with his investigation into the fire, Detective Gray was privy to Plaintiff's insurance file, including Mr. Wydra's report.  Detective Gray was further privy to Lt. Sadlier's report and also took multiple statements from Plaintiff himself.

On April 3, 2003, Gray interviewed Plaintiff using an "Owner Interviewing" form provided by the Department of Treasury, Bureau of Alcohol, Tobacco and Firearms.  In this interview, Plaintiff did not state that he had been by the Property at 5:30 a.m. on the morning of the fire.  He *did* state that there were two sets of keys to the Property and that a set was lost.  He told Detective Gray that Crystal had one set.  (Doc. # 25-18; 30-5 at p. 24.)  In response to a specific question on the form as to why the fire may have been set, Plaintiff indicated that he did not know.  In addition, during this interview, Plaintiff gave Detective Gray the name of an individual who had allegedly seen Plaintiff and Ms. Sparks near a Giant Eagle store in the early morning hours of March 5.

At some point during his investigation, Detective Gray began to focus on Plaintiff as the prime suspect in the fire.  There were several factors which Detective Gray relied upon in focusing his suspicion on Plaintiff.  For one, the Property had been unoccupied for some period of time prior to the fire, was apparently secure at the time the fire broke out, and showed no signs of forced entry (other than the front door, which had been kicked in by the independent witness).  Plaintiff had stated to Mr. Wydra that he and Crystal possessed keys to the house, but that he had taken Crystal's key away from her.  This suggested that Plaintiff had unique access to the Property.

Second, Detective Gray maintains that Plaintiff made several statements concerning his whereabouts on the night of the fire which seemed unusual and/or inconsistent with other information.  According to Detective Gray, Plaintiff had admitted being by the Property several times during the night and early morning hours before the fire because he had concerns about the house.  (Doc. # 25-16.)  Plaintiff acknowledges being at the Property at about 10:00 p.m. the night before the fire for the purpose of

dropping off some clothes and collecting his dogs but, according to Detective Gray, Plaintiff gave differing explanations as to why he collected his dogs – allegedly stating on one occasion that he had retrieved them because he intended to sell them on eBay and, on another occasion, stating that he had gotten them because they had an appointment with the groomer the next day.  Plaintiff had also admitted driving by the Property at about 2:30 in the morning on March 5 on his way back from Hamot Medical Center.  According to Detective Gray, Plaintiff had offered the name of "Curtis Carr" or "Kirky Carr"[5] as an individual who had seen Plaintiff near the Giant Eagle where Plaintiff and Ms. Sparks had stopped to get some Pedialite on their way back to Ms. Spark's house; however, when Detective Gray interviewed Mr. Carr, he denied knowing Plaintiff.  (Doc. # 25-8.)  Detective Gray also insists that Plaintiff admitted being by the Property at 5:30 a.m. on the morning of the fire.  According to Defendant Gray, Plaintiff also admitted this fact to Lt. Sadlier of the Erie Fire Department but, in other accounts, denied that the 5:30 a.m. visit occurred.  (Doc. # 25-16.)  These alleged inconsistencies led Detective Gray to conclude that Plaintiff was not being truthful.

Third, Detective Gray concluded that Plaintiff had a financial motive for setting the fire.  During the course of his investigation, Detective Gray became aware that Plaintiff was behind on certain utility bills at the Property which were in his name and that he was also carrying two high interest mortgages on the Property as well as a high interest loan on his vehicle.  Detective Gray concluded that Plaintiff had a cash flow problem in that his income every month was insufficient to meet his expenses.  (Doc. # 25-20; 25-21.)

Fourth, Detective Gray believed there was evidence demonstrating Plaintiff's intent to set the fire.  It is undisputed that investigators concluded the fire was incendiary in nature.  Detective Gray opined from his inspection of the premises that the

---

[5] The individual to whom Detective Gray claims he was referred by Plaintiff variously appears in the record as "Curtis Carr" or "Kirky Carr."  (See Doc. # 25-16; 30-2, pp. 16-18.)

house was sparsely furnished and that there was a conspicuous lack of personal effects, suggesting that valuables may have purposefully been removed ahead of time. In addition, Plaintiff had removed his dogs the night before the fire. Detective Gray also believed that the house was insured for an amount in excess of what it would cost to rebuild and that a claim had been made for more items than were actually in the home. Most significantly, however, Detective Gray was suspicious of the fact that, on the day prior to the fire, Plaintiff had taken Tammie Porter's name off of the insurance policy, ostensibly leaving Plaintiff as the sole beneficiary of any insurance proceeds.

Finally, Detective Gray concluded that there was a lack of any credible leads as to other suspects who could have started the fire. Although Detective Gray was aware of Crystal Porter's shooting – allegedly at the hands of several Dominicans – and although the family had given the police information that the Dominicans were reportedly back in town and may have set the fire, Crystal did not initially provide any specific information as to the identity of her attackers. (Doc. # 25-6; 25-8; 30-2, at p.25.) Detective Gray made a general inquiry with the Erie Police Department's drug and vice unit about the rumor that the "Dominicans" were back in town but was told that his colleagues had no information concerning this rumor. (Doc. # 26-4.) Detective Gray also believed that the fire in question did not fit the profile of a retaliatory arson because there had been no sign that the fire was started in a violent manner by, e.g., use of a "Molotov cocktail." (Doc. # 25-28.) Additionally, at the time of the fire, there was a large rotweiller penned in Porter's backyard. Gray believed that anyone entering from the rear of the house would have been confronted by this dog, yet Porter's next door neighbor, who was interviewed, made no report of having heard the dog that morning. (Doc. # 30-5, p. 37.)

Citing many (though not all) of the above factors, Detective Gray obtained several search warrants for Plaintiff's credit and financial records.[6]  On December 24, 2003, Detective Gray obtained a warrant for Plaintiff's arrest.  Plaintiff was charged with arson, causing or risking a catastrophe, criminal mischief, recklessly endangering another person, and insurance fraud.  He was eventually tried in the Erie County Court of Common Pleas in August of 2004.  By the second day of trial, all charges were dismissed on the ground that there was insufficient evidence to warrant submitting Plaintiff's case to the jury.

Plaintiff subsequently filed this suit, asserting that Detective Gray violated his rights under the Fourth Amendment to be free from unreasonable searches and seizures and not to have warrants issued against him without probable cause. Plaintiff's theory is that Detective Gray immediately focused upon him as the likely suspect and intentionally ignored or declined to investigate facts which, if uncovered, would have negated probable cause for the arrest.  Plaintiff maintains that Detective Gray executed affidavits in support of the various warrants which included knowingly false and intentionally misleading information and/or which omitted facts that were material to the district judge's probable cause determination.  Moreover, Plaintiff alleges that Detective Gray conducted his investigation in this manner because of Plaintiff's race, thus depriving him of his Fourteenth Amendment right to equal protection of the laws.  Defendant Gray has moved for summary judgment on Plaintiff's § 1983 claims.

## II.  STANDARD OF REVIEW

Summary judgment should be awarded when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

---

[6] These search warrants are dated September 30, October 1, and October 4, 2003.  Each of the affidavits in support of these warrants is essentially identical.

entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  In applying this standard, we view all of the evidence of record in the light most favorable to, and draw all reasonable inferences in favor of, Plaintiff, the non-moving party. MBIA Ins. Corp. v. Royal Indem. Co., 426 F.3d 204, 209 (3d Cir.2005).

### III.  DISCUSSION

To prevail on a claim brought under 42 U.S.C. § 1983, the Plaintiff must establish that the Defendant :  (1) acted under color of state law; and (2) deprived Plaintiff of a right secured by the Constitution.  Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).  As noted, Plaintiff asserts violations of his rights under the Fourth and Fourteenth Amendments, which we will address in order.

### A. PLAINTIFF'S FOURTH AMENDMENT CLAIMS

The Warrant Clause of the Fourth Amendment provides that "no Warrants shall issue but upon probable cause, supported by Oath or affirmation."  U.S. CONST. AMEND. IV.  To succeed in a § 1983 action for false arrest made pursuant to a warrant, the Plaintiff must prove that (1) the officer "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;" and (2) that "such statements or omissions are material, or necessary, to the finding of probable cause."  Wilson v. Russo, 212 F.3d 781, 786-87 (3d Cir. 2000) (internal quotation marks and citations omitted).  See also Franks v. Delaware, 438 U.S. 154, 171-72 (1978).  This standard applies both to search warrants and arrest warrants.  See Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997) (challenge to search warrant); Wilson, supra, at 786 (challenge to arrest warrant).

A showing that the officer acted with negligence or innocent mistake is insufficient.  Wilson, 212 F.3d at 787.  Rather, a plaintiff must show that the officer acted with at least a reckless disregard for the truth.  This mens rea is shown if the officer "withholds a fact in his ken that any reasonable person would have known ... was

9

the kind of thing the judge would wish to know." Wilson, *supra,* at 788 (internal quotation and alteration omitted).  Alternatively, an officer makes an assertion with reckless disregard for the truth when, "viewing all the evidence, the [officer] must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." Id.

In determining the materiality of the misstatement or omission, the court must "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." Wilson, *supra*, at 789.  The existence of probable cause is fatal to Plaintiff's Fourth Amendment claim.  See Herman v. City of Millville, 66 Fed. Appx. 363, 365, 2003 WL 21007244 at **2 (3d Cir. May 5, 2003) (probable cause is a complete defense to Fourth Amendment claims); Groman, 47 F.3d at 634 (to prevail on a claim of false arrest under § 1983, plaintiffs would have to prove lack of probable cause to arrest). This is true irrespective of the outcome of Plaintiff's criminal proceedings.  See Wright v. City of Philadelphia, 409 F.3d 595, 602 (3d Cir. 2005) ("[I]t is irrelevant to the probable cause analysis what crime a suspect is eventually charged with ... or whether a person is later acquitted of the crime for which she or he was arrested.") (internal citations and quotations omitted).

In sum, then, our analysis is two part.  First, we consider whether the historical facts of record, construed most favorably to Plaintiff, would support a finding that Detective Gray made statements or omissions in his affidavits that he "'knew [were] false, or would have known [were] false except for his reckless disregard for the truth.'" Wilson v. Russo, 212 F.3d at 787 (quoting United States v. Leon, 468 U.S. 897, 923 (1984)).  Assuming this *mens rea* element is satisfied, we next consider whether such misstatements or omissions are material to a finding of probable cause.[7]

---

[7] Citing DiNicola v. DiPaolo, 25 F. Supp. 2d 630 (W.D. Pa. 1998), Defendant assumes (without explanation) that our probable cause analysis should consider the entire body of facts known to the arresting officer at the time of the challenged arrest, without regard to the four corners of the arrest

1. <u>The Alleged Falsehoods</u>

   *(i).  The Change on the Insurance Policy*

In his various affidavits, Detective Gray represented:

> ... that Mr[.] Porter had made changes in his insurance policy on [the Property].  He had his ex wives [sic] name removed from the policy so that any monies collected on any claim at that address would all be payable to him alone.  This was done on 03-04-03[,] the day before the fire[,] even though they had been legally divorced since December, 2002.

Plaintiff appears to take issue with two inaccuracies.  First, he points out that he and

Tammie Porter were only separated at the time of the fire and did not get divorced until

---

warrant.  In <u>DiNicola</u>, we adopted this approach and concluded that the police officers did not actually need to rely on the arrest warrant in order to effectuate a lawful arrest of the plaintiff within his home because there was uncontroverted evidence that the officers had gained consensual entry therein.  We recognized that "an individual's privacy interest in the sanctity of his or her home is a primary concern behind the requirement for an arrest warrant" when a residential arrest is made.  <u>Id.</u> at 638 (citing <u>Payton v. New York</u>, 445 U.S. 573, 587 (1980)).  Because DiNicola had voluntarily permitted the officers inside his house prior to the time they presented him with the arrest warrant, we concluded that an exception to the usual warrant requirement applied.  Thus, the arrest could be treated as a warrantless arrest and could be upheld, provided that the facts known to the officers at the time objectively established probable cause.  <u>See generally DiNicola</u>, 25 F. Supp. 2d at 638-39.  In this case, there is no assertion that Defendant Gray gained consensual entry into Plaintiff's home at the time of his arrest.  Thus, the rationale of <u>DiNicola</u> is not implicated here.

On the other hand, the arrest warrant may have been superfluous on other grounds.  The record suggests that Plaintiff was arrested ***in front of*** the residence he shared with Ms. Sparks.  (<u>See</u> Gray Police Report [Doc. # 30-5 at p. 38].)  If so, then Plaintiff was arrested in a "public place" for Fourth Amendment purposes, and no warrant was required, provided the arrest was supported by probable cause.  <u>See United States v. Watson</u>, 423 U.S. 411 (1976) (police with probable cause to arrest may arrest a person in public without a warrant); <u>United States v. Santana</u>, 427 U.S. 38, 42 (1976) (person standing in the doorway of a house is "in a 'public' place," and hence subject to arrest without a warrant); <u>Kirkpatrick v. Butler</u>, 870 F.2d 276, 280 (5th Cir. 1989) (Police detective had probable cause to believe that petitioner had committed arson and could therefore make warrantless arrest in petitioner's doorway or on his porch, since that was a "public place"); <u>Duncan v. Storie</u>, 869 F.2d 1100, 1102 (8th Cir. 1989) (If, as defendants claimed, plaintiff had voluntarily left the confines of his home, then his arrest was made in a public place and the arresting officers need only demonstrate that there was probable cause in order to justify the arrest; material issue of fact existed as to whether plaintiff had voluntarily left the confines of his home when arrested); <u>U.S. v. Hagerman</u>, No. 1:02 CV 00106, 2003 WL 21135702 at *4 (W.D.Va. May 15, 2003) (arrest made in defendant's yard, "one step" away from his porch, was in a public place for Fourth Amendment purposes).

Even if Plaintiff was in a public place at the time of his arrest, however, neither party has argued this point and, by clearly premising his Fourth Amendment challenges on alleged deficiencies in the warrants, Plaintiff seems to presume that a warrant was required to effectuate his arrest.  Moreover, even if no warrant was technically required for Plaintiff's arrest, presumably warrants <u>were</u> required to support the searches which form a part of Plaintiff's § 1983 claim.  For all of these reasons, we will proceed along the line of analysis set forth above.  We will examine the warrants at issue and, assuming the historical facts of record most favorable to Plaintiff, we will determine whether the "corrected" affidavits in support of the warrants establish probable cause.

much later, after the criminal matter was resolved.  Second, Plaintiff objects that the affidavit fails to mention his explanation for the policy change.

With respect to Plaintiff's first objection, the record does not support an inference that Detective Gray acted with reckless disregard for the truth.  The point that Detective Gray was apparently trying to make in his affidavit was that the timing of the policy change was suspicious:  ostensibly, Plaintiff had grounds to remove Tammie from the policy in December of 2002 but waited until March 4, 2003 – the day before the fire – to do so.  Although Plaintiff and Tammie Porter were actually still married at the time of the fire, it is undisputed that Tammie Porter had signed over her interest in the Property to Plaintiff by way of a quitclaim deed executed in December of 2002.  (Doc. # 30-6, pp. 17, 21; 30-3, pp. 19-21.)  Thus, the essence of Detective Gray's representation was accurate:  Tammie Porter's legal interest in the property was presumably terminated in December of 2002 but she was not taken off the policy until more than two months later, immediately prior to the fire.

We reach a different conclusion as to Plaintiff's second objection.  Plaintiff asserts that, a week or so before the fire, he had received a declaration sheet from the insurance company which continued to list Tammie as a beneficiary on the policy.  Because Tammie had previously transferred her interest in the property, Plaintiff explains, he notified his insurance agent and had her name removed from the policy.  (Doc. # 30-6 at pp. 20-21.)  Plaintiff does not dispute the fact that this change occurred on March 4, the day before the fire.  (Id. at p. 22.)  Crediting this explanation, we agree that its omission could constitute reckless disregard for the truth on the part of Detective Gray.  The timing of the policy change is suspicious and suggests a purposefulness on Plaintiff's part which, in turn, lends support to the theory that Plaintiff intended to start the fire.  However, Plaintiff's explanation as to the timing of events tends to mitigate this evidence of intent.  We believe it is the kind of information that a neutral magistrate would obviously want to know about in making a probable cause determination.

The question thus becomes whether the information about the policy change was known to Detective Gray at the time he submitted his affidavits.  Detective Gray evidently had grounds to believe that Tammie's interest in the Property was extinguished in December of 2002.  However, it is less clear whether Detective Gray was aware of facts (i.e., the issuance of a declaration sheet bearing Tammie's name) that would support Plaintiff's explanation as to the timing of events.  The record does not speak directly to this issue; it contains neither the declaration sheet nor Detective Gray's complete investigative file.  However, there is evidence of record suggesting that Detective Gray came into possession of Plaintiff's insurance file during the course of his investigation.  (Doc. # 30-5, pp. 31-32.)  Therefore, crediting Plaintiff's version of events, a jury could reasonably infer that Detective Gray would have been in possession of information showing that a declaration bearing Tammie Porter's name had been issued shortly before the change on the policy occurred.  Consequently, we conclude for present purposes that this information was recklessly omitted from Detective Gray's affidavit.

### (ii).   The 5:30 a.m. visit

Detective Gray states in his affidavits that Plaintiff admitted driving past the Property "multiple times the night and early morning hours before the fire because he was worried that 'something may happen to the house,' and he noticed nothing out of the ordinary."  (Doc. # 30, p. 4.)  Although it is not expressly mentioned in the affidavits, Gray was referring in part to an alleged admission by Plaintiff that he had been by the Property at about 5:30 a.m. on the morning of the fire.  This admission, if accepted, would place Plaintiff in the vicinity of the crime approximately one hour and fifteen minutes prior to the time the fire was reported.  If, as Gray suspected, a delay device had been used to start the fire, then Plaintiff's presence in the vicinity of the fire at 5:30 a.m. is potentially incriminating.

13

Plaintiff denies that he ever made such an admission. He maintains that he told the various investigators only that he had last been inside the house at approximately 10:00 p.m. on March 4 (to drop off some clothes and pick up his dogs) and 2:30 a.m. on March 5 when he incidentally passed the Property on his way from Giant Eagle back to Ms. Sparks' house. When questioned about the discrepancy, Plaintiff claimed that he may have told investigators that he was at the Property *on March 4* at 5:30 a.m. to check on the dog he was keeping in his back yard for a friend. We accept Plaintiff's assertions for present purposes and assume that Plaintiff neither stated he had been by the Property at 5:30 a.m. on March 5 nor expressed concern that "something may happen to the house." To the extent Detective Gray alleges that Plaintiff made the disputed admission directly to him (i.e., *to Gray*), we credit Plaintiff's assertion that he did not.

Nevertheless, there is apparently unrebutted evidence that Lt. Sadlier of the Erie Fire Department documented in his *own* report that Plaintiff had admitted being at the Property at 5:30 a.m. on the morning of the fire.[8] It is not disputed that Detective Gray was privy to Lt. Sadlier's investigative file during the course of his investigation. Therefore, to the extent Plaintiff's supposed admission about the 5:30 a.m. visit is independently documented by Lt. Sadlier, Detective Gray would have been entitled to rely on this information, at least absent some evidence showing that Detective Gray had reason to doubt the accuracy of Lt. Sadlier's report.[9] See Whiteley v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971) (arresting officers are entitled to rely on knowledge of other officers in making arrest). See also Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2002) (police officers, when making a probable cause determination,

---

[8] While Plaintiff strongly denies ever having made the admission about a 5:30 a.m. visit to the Property on March 5, he apparently does not challenge the Defendant's representation that Lt. Sadlier documented such an admission in his report. (See Doc. # 30-6 at pp. 40-41; # 25-22; # 30-5 at p. 26.)

[9] As noted *supra* at n.3, neither party has submitted Lt. Sadlier's report into the record. Although the Defendant references the report in its brief and purports to include the report in its exhibits, the undersigned has been unable to locate the report in the court file.

14

are entitled to rely on the allegations of fellow police officers) (citing <u>Bernard v. United States</u>, 25 F.3d 98, 102-03 (2d Cir.1994)); <u>Beal v. City of New York</u>, 89 F.3d 826, 1995 WL 722263 at *2 (2d Cir. Nov. 21, 1995) (Table No. 95-7344) (it was objectively reasonable for arresting officer to rely on the eyewitness report of a senior officer, since probable cause may be based on "information from some person who it seems reasonable to believe is telling the truth") (citation omitted); <u>Hernandez v. Conde</u>, 442 F. Supp. 2d 1141, 1154 (D. Kan. 2006) (In making arrest, police officers may rely on the information provided by other officers or law enforcement bodies, and may rely on these parties' judgment.).

Plaintiff has produced no evidence to suggest that Detective Gray had grounds to doubt the accuracy of Lt. Sadlier's report.[10]  Thus, for present purposes, we assume that, at the time of completing his affidavits, Detective Gray was aware of Lt. Sadlier's report that Plaintiff had admitted being by the Property at 5:30 a.m. on the morning of the fire.

### (iii.)  Removal of Plaintiff's dogs

According to Detective Gray's search warrant affidavit, Plaintiff stated that he had last been in the house at about 10:00 p.m. on March 4 to drop off some clothing and to take his dogs out of the house, as he was going to sell them on eBay.  Both the search warrant and the arrest warrant affidavits state that Plaintiff had given inconsistent statements as to why he removed his dogs the night before the fire.

---

[10] If, for example, Lt. Sadlier's report asserted that <u>both</u> Sadlier and Gray were present when the Plaintiff made his supposed admission about the 5:30 a.m. visit, then Plaintiff might well argue that Gray, having been privy to the interview, was fully aware that the alleged admission had never been made. Under such circumstances, a finding of reckless disregard for the truth (or even intentional falsehood) would be supportable because Gray would have had obvious grounds to doubt the accuracy of Lt. Sadlier's report.  Plaintiff has produced no evidence in this regard, however.  In fact, Detective Gray asserts that he and Lt. Sadlier were told separately about Plaintiff's 5:30 a.m. visit to the Property.  (Doc. # 25-37.)

Plaintiff objects that he never gave inconsistent statements about his reasons for removing the dogs and never stated to Gray that he was planning to sell them on eBay. Plaintiff insists he told Gray only that the dogs were removed because he had made an appointment to have them groomed on the day of the fire. Detective Gray apparently never attempted to verify the alleged appointment by, e.g., obtaining a statement from the groomer. Plaintiff points out that his own deposition and his sworn statement of January 17, 2004 are consistent about his removing the dogs for a grooming appointment, and Mr. Wydra's report is simply silent on the matter; thus, only Detective Gray's report and affidavits indicate a discrepancy relative to the removal of the dogs.

Crediting (as we must) Plaintiff's assertion that he never made any statements about selling the dogs on eBay, we are left without any explanation as to why Detective Gray would have included the eBay reference in his affidavit. If Plaintiff never made the statement, then it is hard to see how Detective Gray could not have had serious doubts about the accuracy of the eBay comment. Thus, a jury could reasonably infer that Detective Gray acted with at least reckless disregard for the truth in asserting: (1) that Plaintiff claimed to have removed of his dogs for the purpose of selling them on eBay, and (2) that Plaintiff had been inconsistent with respect to his professed reason for removing the dogs.

### (iv.) Plaintiff's Alibi witness

Detective Gray asserts the following in his search warrant affidavit:

> [Plaintiff] also gave a detailed statement as to his activities the day and night before the fire which included places he was at and people he saw. Upon trying to verify some of this information, I found out that Mr[.] Porter supplied me with false information. This was verified after I interviewed a party whom Mr[.] Porter claimed he had spoken with in person not far from the area of Buffalo Road and Franklin Ave. during the early morning hours on the day of the fire.

[Doc. 30, p. 5.] Similar assertions appear in Detective Gray's arrest warrant affidavit.

These averments refer to an interview Detective Gray conducted with one "Kirky

16

Carr" – also referred to in the record as "Curtis Carr" (see Doc. # 25-16; 30-2, pp. 16-19 and n. 5, *supra*), an individual supposedly identified by Plaintiff as a witness whom Plaintiff saw near the Giant Eagle on his way back from Hamot Hospital to Ms. Sparks' house.  When Detective Gray interviewed Mr. Carr, Mr. Carr denied knowing Plaintiff. Based on this discrepancy, Detective Gray concluded that Plaintiff had been untruthful about his whereabouts in the hours preceding the fire.

Plaintiff counters, however, that Detective Gray interviewed the wrong individual. Plaintiff insists that the name he gave Detective Gray was "*Curtis Carson*," and that he did not give Detective Gray the name "Kirky Carr" for any purpose.  It is undisputed that Detective Gray never interviewed Curtis Carson and that Mr. Carson eventually provided a statement to Plaintiff's criminal attorney which corroborated Plaintiff's account of seeing Mr. Carson near the Giant Eagle in the early morning hours of March 5.  Assuming Plaintiff's version of events is correct, the record provides no explanation as to how this confusion over the identity of Plaintiff's witness occurred, other than the rough similarity between the names.  A reasonable jury could conclude, however, that Detective Gray's misstatement about the alibi witness involved at least a reckless disregard for the truth.

### (v.)   Plaintiff's Financial Arrears

Detective Gray's search warrant and arrest warrant affidavits represent that, at the time of the fire, Plaintiff had two high-interest mortgages on the Property, had a high-interest vehicle loan, and owed money to various utility and loan companies.  The affidavits further state that Plaintiff was in arrears to all of the utility companies, had received some shut-off notices with respect to his utilities, and had some accounts in collections.  Detective Gray averred that "[Porter] had been experiencing a cash flow problem in which his income was not sufficant [sic] to pay all the monies owed.  The only account which was current was the one with the insurance company." (Doc. 26-11,

17

p. 5.]  The actual financial records upon which Detective Gray relied in making these
representations are not part of the evidentiary record.

Plaintiff acknowledges that he had two outstanding high-interest mortgages on
the Property as well as a vehicle loan, but he denies that he was behind on these
payments as of March 5, 2003.  He claims that, while he may have occasionally been
behind on his mortgage payments in the past, things had never progressed to the point
of threatened foreclosure.  (Doc. # 30-2, p. 5.)  In addition, while Plaintiff admits to
being behind on his telephone, gas, and water bill payments (Doc. # 30-2, p. 5; 30-6 at
pp. 23-25, 28-29, 31), he claims that the amount in arrears was less than $2,000 and
that he was never threatened with his utilities being shut off.  (Doc. # 30-6, pp. 23, 25,
28-29, 31-32.)  Plaintiff admits that he was sometimes short on cash with the arrival of
his new baby and that it sometimes got difficult to pay the bills when they came due
(Doc. # 30-6, pp. 28-29), but he denies that he had financial problems at the time of the
fire.  (Id. at p. 32.)  He further claims that some of the late payments on utility bills
resulted from the fact that his daughter Crystal was in the process of assuming
responsibility for those bills.  (Id. at pp. 23-25.)

To the extent Detective Gray's representations as to Plaintiff's financial arrears
contain any inaccuracies, there is insufficient evidence to support a finding that the
inaccuracies were made intentionally or with reckless disregard for the truth.  The point
that Detective Gray was attempting to make is that Plaintiff owed monies to third parties
at the time of the fire, had an apparent cash flow problem and, therefore, had a
financial motive to commit the arson.  That point is essentially accurate, as it is
undisputed that Plaintiff had two high-interest mortgages on the Property (with respect
to which he had a history of late payments) and was behind on his utility bills.  It is
immaterial for present purposes that Crystal Porter was taking over certain utility
payments on the Property, since the bills were in Plaintiff's name (Doc. 30-6, p. 27) and
therefore remained his legal responsibility.  Moreover, there is no evidence suggesting
that Detective Gray was aware of Crystal's involvement in paying the bills at the time he

submitted his affidavits.  To the extent, then, that Detective Gray misstated information

relative to Plaintiff's financial arrears, the discrepancies were minor and Detective Gray

had no obvious reasons to doubt the accuracy of the information he reported.

Consequently, the evidence does not support a finding that he was reckless in this

regard.


### (vi.)   Gilbert Marsh

Plaintiff objects that Detective Gray's affidavits fail to mention that an individual

by the name of Gilbert Marsh had allegedly witnessed Plaintiff and his son leaving Ms.

Sparks' house at approximately 6:50 a.m. on the morning of the fire when Plaintiff was

going to work.[11]  It is not disputed that Plaintiff identified this witness to Detective Gray

during the course of his investigation and that Detective Gray declined to obtain a

statement from Mr. Marsh.  We conclude that a jury could find Detective Gray reckless

in omitting any reference of Mr. Marsh in the warrant affidavits.  On this record, a jury

could find that any reasonable person would have known that this was the kind of

information a neutral magistrate would want to know about in making a probable cause

determination.


### (vii.)   Lack of Personal Effects

In both the search warrant and arrest warrant affidavits, Detective Gray stated

that he and the Erie Fire Department investigators examined the scene following the fire

and noticed a lack of personal effects inside the house.  Plaintiff disputes this assertion

and insists that there was a substantial amount of furniture and personal effects inside

the home at the time of the fire and that the furnishings, in particular, had not changed

from the time that his entire family had resided in the house.  The record contains no

---

[11] Plaintiff represents in his brief that Mr. Marsh would have placed him inside Ms. Sparks' house
for at least 25 minutes prior to his 6:50 a.m. departure.  However, the portions of the record cited by
Plaintiff do not actually support this averment.  (See Porter Dep. [Doc. No. 30-2] at pp. 95, 143, 167.)

other information on this point and, thus, we are left with a simple "he said- he said" dispute which requires the finder of fact to make a credibility determination.  We are required to credit Plaintiff's allegations in this regard.  Under the circumstances, a jury could conclude that Detective Gray must have entertained serious doubts as to the truth of his statements.[12]

### (viii.)  The Rottweiler

In his affidavit in support of the arrest warrant, Detective Gray states "a large dog was observed in the backyard, this dog would bark and growl while we were there and would more that [sic] likely have done so to someone prowling about the house in the morning hours before the fire[.]"  Elsewhere the affidavit notes that Plaintiff had a large Rottweiler enclosed in a pen in the back yard, as he was watching the dog for a friend. The apparent inference to be drawn from these statements is that someone familiar to the Rottweiler probably set the fire.

Plaintiff objects to this statement on the grounds that there is nothing of record to show that Detective Gray made any attempt to investigate the dog's usual habits or demeanor.  In fact, Plaintiff claims that the dog, which was not his, was typically very friendly and normally barked only at people in uniform.

---

[12] Plaintiff claims that Defendant Gray's December 24, 2003 affidavit in support of the arrest warrant also contains the following "falsehoods":  (1) Gray asserted that, when he went to the back bedroom of the house to confirm Plaintiff's statement about dropping clothing off the night before, no men's clothing was immediately in sight; (2) Gray asserted that the house was insured for more than it would have cost to rebuild (but he failed to mention the fact that neither Plaintiff nor Tammie Porter had increased the insurance coverage on the home in the year preceding the fire); (3) Gray asserted that it is not known why Plaintiff drove past the Property at 2:30 a.m. on the morning of the fire (when, in fact, Plaintiff claims, the reason for the 2:30 drive-by was known to Gray, as Gray had had his people verify Plaintiff's emergency visit to Hamot Medical Center) and (4) Gray asserted that Plaintiff made a claim for many more items than were actually in the home at the time of the fire.  Upon inspection of the December 24, 2003 arrest warrant, we do not find these challenged statements referenced in Gray's affidavit. Although some of this information may have been contained in Detective Gray's police report, there is no indication that the report was actually appended to the sworn affidavit in support of the warrant. Accordingly, because the challenged statements are not in Detective Gray's affidavit, we need not consider them further.

Plaintiff's objections do not support a finding that Detective Gray acted with reckless disregard for the truth as to this point.  The fact that Gray made no attempt to investigate the dog's usual habits and that he was making inferences about the dog's probable demeanor based solely on his own anecdotal encounter with the dog can be assumed from the affidavit itself.  Similarly, Plaintiff's observation that the dog was discovered growling and barking shortly after *a fire* had occurred on the Property (hardly a calming event, as Plaintiff points out) is self evident.  As for Plaintiff's assertion that the dog was actually friendly and only barked at individuals in uniform, there is no indication that Detective Gray was made aware of this information prior to the time Plaintiff was arrested.  Under the circumstances here, a jury could not reasonably conclude that Detective Gray was recklessly or deliberately untruthful in discussing his observations about the Rottweiler.

### (ix.)    Failure to Pursue or Mention Exculpatory Evidence

Finally, Plaintiff objects that Detective Gray deliberately ignored and failed to pursue evidence that would have exculpated him.  It is not disputed that, on or around February 18, 2003, Crystal Porter was shot at the Property, reportedly by several Dominicans over an incident involving stolen drugs.  There is no dispute that Detective Gray was aware of this shooting.  The record further shows that Plaintiff's cousin, Adreana Logan, had been identified as an individual whose visit to Erie coincided with the shooting incident.  Detective Gray was possessed of these basic facts through several sources:  for one, Detective Gray had taken Crystal Porter's initial statement at the hospital on the night she was shot; second, he was in possession of Mr. Wydra's report, which referenced the incident; third, Plaintiff had advised Detective Gray of a remark Plaintiff's father had made to the effect that the Dominicans were reportedly back in town and may have started the fire; fourth, one of Gray's colleagues, Detective Holmes, advised Gray that, a couple days before the fire, Plaintiff and his daughter had expressed concern that the Dominicans might be back in town; fifth, prior to Plaintiff's

arrest, his attorney had met with Detective Gray and the Assistant District Attorney handling the case and had suggested a connection between Crystal's shooting and the fire.

Despite being possessed of this information, Detective Gray never interviewed Crystal Porter, nor did he make any effort to locate or obtain a statement from Adreana Logan concerning her knowledge of the events. Detective Gray did make a general inquiry with the Erie Police drug and vice unit as to the rumor that the Dominicans might have been back in town at the time of the fire, but this inquiry yielded no information. Beyond that, Detective Gray did not pursue any investigation of the Dominicans. Based on these facts, Plaintiff insists that "abundant exculpatory evidence was omitted from the affidavit and, in many cases, was not even investigated by Mr. Gray despite his knowledge of same." (Pl.'s in Opp. to Def.'s Mot. for Summ. Judg. [Doc. No. 28] at p. 16.)

An officer swearing out an affidavit in support of a warrant cannot simply ignore or omit known evidence that is plainly exculpatory. See Wilson v. Russo, 212 F.3d at 790 ("An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists.") (quoting Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999)). On the other hand, "[o]nce a police officer has discovered sufficient facts to establish probable cause, the officer has no constitutional duty to further investigate in hopes of finding exculpatory evidence." Patterson v. School Dist. of Philadelphia, No. Civ. A. 99-CV-4792, 2000 WL 1020332 at *6 (E.D. Pa. July 19, 2000). Further, in applying for a warrant, police officers are not required to recount every detail of an investigation, no matter how small. See Wilson, supra, at 787 ("All storytelling involves an element of selectivity. We cannot demand that police officers relate the entire history of events leading up to a warrant application with every potentially evocative detail that would interest a novelist or gossip."). See also Steele v. City of Erie, 113 Fed. Appx. 456, 459, 2004 WL 2360160 at **3 (3d Cir. Oct 20., 2004) ("Nothing in our jurisprudence

requires a police officer seeking an arrest warrant to present every scintilla of information acquired during an investigation to satisfy the standard for a finding of probable cause, as long as his submission is made in objectively good faith.").

In this case, both Detective Gray's search warrant and his arrest warrant affidavits reference the Plaintiff's theory that the fire may have been started by drug dealers in retaliation against Plaintiff's daughter, who used to reside at the Property. Crystal Porter's apparently uncontradicted account of having been shot by the drug dealers inside the house just weeks before the fire lends some credence to this theory. Detective Gray omitted any reference to this shooting, however, and we conclude it is the type of information that a neutral magistrate would obviously want to know about in passing on the warrant application. Therefore, we conclude that a jury could find Detective Gray reckless in his disregard for the truth by omitting the information about Crystal's shooting.

Plaintiff goes further, however, and complains that Detective Gray failed to investigate exculpatory leads relative to the Dominicans. In this regard, Plaintiff appears to be "inject[ing] a due process argument into what is primarily a fourth amendment claim," Wilson, 212 F.3d at 789 n.5, essentially claiming that Detective Gray was negligent in his investigation. "However, negligence by public officials is not actionable as a due process deprivation of a civil right." Id. (citing Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995)).

Moreover, we cannot say that the information cited by Plaintiff constituted obvious leads in light of what was known to Detective Gray at the time he submitted his warrant applications. At no time prior to Plaintiff's arrest did either Crystal Porter or Plaintiff provide Gray any specific information concerning the identities of persons who may have been involved in starting the fire. What was known to Gray was only that several "Dominicans" had been involved in the shooting incident at the Property. Specific names were never brought to his attention during the investigation and the Erie Police Department's drug and vice unit could provide no information relative to the

Dominican drug dealers.  Several weeks *after* Plaintiff was arrested, Crystal Porter generated a written statement (dated January 14, 2004) in which, for the first time, she identified the perpetrators of the shooting as "Christian," "Kenny," and "Pablo." However, Plaintiff himself was not previously aware of this information, and thus never provided these names to Detective Gray during the course of Gray's nine-month investigation.  In fact, when Mr. Wydra interviewed Plaintiff regarding the shooting, Plaintiff reportedly stated that Crystal "did not know" the perpetrators.  (See Doc. 26-5, p. 8.)  Under these circumstances, it would be reasonable for Detective Gray to assume that Crystal had no specific information to offer concerning the Dominicans or their possible role in the fire.

Plaintiff insists, though, that Detective Gray should have attempted to locate Adreana Logan and take a statement from her relative to his investigation of the fire. However, Ms. Logan was never specifically identified to Gray as a person with knowledge concerning the fire.  While it is true that Mr. Wydra referenced Ms. Logan in his report to the insurance company, she was identified only as a person whose visit with Crystal Porter coincided with the shooting:

> When I asked Mr. Porter to describe the shooting, he stated that his first cousin, Adrena [sic] Logan, approximately 32 to 33 years old, came to visit his daughter.  At the same time, three men he described as Dominicans forced their way into his house.  They shot his daughter once in the thigh area of her right leg.

(Doc. # 26-5, p. 7.)  The remainder of the report does not reference Ms. Logan, nor does it implicate her in the shooting; in fact, as mentioned above, Plaintiff indicated only to Mr. Wydra that the shooters were Dominicans and that Crystal did not know them.

In sum, while one might argue that Detective Gray could have performed a more thorough investigation by obtaining or attempting to obtain statements from Crystal Porter and/or Adreana Logan, these arguable deficiencies do not rise to the level of a constitutional violation.  See Wilson, 212 F.3d at 783 n.1 (negligent police work would not violate the due process clause).

24

Furthermore, given the nature of the information available to Detective Gray concerning the Dominicans at the time of Plaintiff's arrest, we cannot agree that it was plainly exculpatory. While Plaintiff may have personally espoused the theory that the Dominicans had set the fire at his Property, Detective Gray did not believe that the manner in which the fire had been set fit the profile of a retaliatory burning. On the contrary, the circumstances of the fire – including the fact that the house was apparently secure at the time the blaze broke out – suggested that only someone with unique access to the Property could have started the fire. In her January 14, 2004 written statement, Crystal Porter claimed for the first time that a set of keys had come into the hands of one of the Dominicans when Ms. Logan made an extra copy of the house key, but this information was never made known to Detective Gray during the course of his investigation. In fact, Plaintiff admitted being surprised himself to learn this information. And, while some evidence suggests that Detective Gray was told prior to Plaintiff's arrest that a set of keys to the Property had been lost, this fact by itself is not plainly exculpatory. Without more information, Detective Gray would have no reason to assume that the lost set of keys came into the hands of persons with a motive to harm Plaintiff or his Property. In fact, there is no basis from which to infer even that the keys were recovered by someone with knowledge as to what lock(s) the keys would open.

We conclude, therefore, that a jury could find Detective Gray reckless in his disregard for the truth only to the extent that he omitted from the affidavit any mention of Crystal Porter's prior shooting at the hands of Dominican drug dealers. As to the other information cited by Plaintiff, we conclude that a finding of recklessness is not supportable because the omitted information was neither plainly exculpatory nor the sort of information that any reasonable person would have considered important for a judge to know.

2.    Materiality

Having found sufficient evidence of at least some omissions and assertions

made knowingly or with reckless disregard for the truth, we next consider whether any

of the alleged falsehoods were material, or necessary, to the finding of probable cause.

See Wilson v. Russo, 212 F.3d at 789.  As we discussed above, our analysis requires

us to "excise the offending inaccuracies and insert the facts recklessly omitted, and

then determine whether or not the 'corrected' warrant affidavit[s] would establish

probable cause."  Id. (citing Sherwood, 113 F.3d at 399).  If they do, summary judgment

for the Defendant is appropriate, because even discounting the omissions and

misrepresentations in Detective Gray's affidavits, Plaintiff would have been lawfully

arrested.  Id.

It is well established that probable cause exists where "facts and circumstances

[are] sufficient to warrant a prudent man in believing that the [suspect] had committed

or was committing an offense."  Sharrar, 128 F.3d at 818.  Otherwise stated, "[p]robable

cause exists if there is a 'fair probability' that the person committed the crime at issue."

Wilson, 212 F.3d at 789 (quoting Sherwood v. Mulvihill, supra, at 401).  Thus, in making

our probable cause assessment, "the inculpatory evidence should be weighed against

the exculpatory evidence to determine whether a reasonable person would believe an

offense has been committed by the suspect."  Cummings v. City of Philadelphia, 137

Fed. Appx. 504, 506, 2005 WL 1532431 at **2 (3d Cir. June 30, 2005).

Taking into account all of the alleged inaccuracies as discussed above,

accepting Plaintiff's version of historical events, and allowing for the necessary

corrections, Detective Gray's affidavit in support of the arrest warrant establishes the

following:

*        A fire was discovered at Plaintiff's property on March 5, 2003 at
         approximately 6:46 in the morning.  The fire was ruled an arson and it was
         determined that gasoline had been used as an accelerant.  It was
         determined that the fire had originated in the kitchen area of the house
         and a large quantity of gasoline had been poured in the front portion of

the house in an attempt to facilitate the fire, but the fire never reached that area.  The fire caused extensive damage to the Plaintiff's Property as well as damage to an adjacent property.

* At the time of the fire, the house was unoccupied, locked and secure, except for the front door which had been kicked in by an independent witness.  There were otherwise no signs of forced entry.

* Plaintiff was not living at the house as of the date of the fire, but had access to it.  Plaintiff was interviewed at the scene and stated that he had last been inside the house the night before at approximately 10:00 pm for the purpose of dropping off some clothes and removing his dogs for a grooming appointment the next day.  Plaintiff stated that he had locked the doors when he left the house.

* In subsequent interviews, Plaintiff gave a detailed account of his activities the day and night before the fire.  Plaintiff claimed that he had spent the evening before the fire at his girlfriend's house and had left her house once during the night to take their daughter to Hamot Medical Center.  Plaintiff stated that he and his girlfriend left the hospital sometime after 2:00 a.m., then stopped at Giant Eagle for some Pedialite and, while at Giant Eagle, saw an individual by the name of Curtis Carson.  Plaintiff represented that the route back to his girlfriend's house took him by the Property, which he passed around 2:30 a.m., at which time he noticed nothing out of the ordinary.  Plaintiff stated that, upon arriving at his girlfriend's house, he remained at that location until about 6:50 a.m. when he left for work.  Plaintiff claims that a neighbor by the name of Gilbert Marsh witnessed him getting into his truck at that time.

* A report by Lt. Sadlier of the Erie Fire Department indicates that Plaintiff admitted being by the Property at 5:30 a.m. on the morning of the fire to check on a dog in the back yard.  No such statement was made to Detective Gray or reported by Mr. Wydra.

* Several weeks prior to the fire, Plaintiff's daughter had been shot inside the home, allegedly by several Dominican individuals who had forced their way into the house.  The shooting involved a dispute over stolen drugs, and the "Dominicans" believed that Plaintiff's daughter, who used to reside at the Property, was responsible for the stolen drugs.  Plaintiff's father had reported hearing a rumor from an unnamed source that these Dominican drug dealers were back in town and he believed that the fire had been set by them as a retaliatory act against the Plaintiff's daughter.  Detective Gray made a general inquiry with the drug and vice unit of his department about the rumor that the Dominicans who had shot Crystal Porter were back in town, but Gray's colleagues could provide no information on the matter.

* Plaintiff removed Tammie Porter's name from the insurance policy covering the Property the day before the fire, even though Tammie had legally transferred her interest in the Property to Plaintiff on December 26, 2002.  A declaration sheet had been issued shortly before March 5, 2003 with Tammie Porter's name still on the policy.

27

    *        At the time of the fire, Plaintiff owed money on the utilities at the
             Property in an amount under $2,000.00.  In addition, Plaintiff had a
             high interest vehicle loan and two high interest mortgage loans on
             the Property.  In the past he had occasionally been late with his
             mortgage payments.

    Based on this information, we conclude that Detective Gray's affidavit, as

amended, establishes probable cause for Plaintiff's arrest.  As our analysis

demonstrates, Detective Gray's "corrected" affidavit sets forth several facts which

incriminate Plaintiff:  Plaintiff was the owner of the Property and had access to it;

Plaintiff was in the vicinity of the Property on the morning of the fire; Plaintiff had a

financial motive to set the fire in the hopes of recovering insurance proceeds; and

Plaintiff took his wife's name off the policy the day before the fire.  Plaintiff's access to

the Property is particularly significant in light of the fact that the fire originated inside the

house, the Property was secure at the time the fire was discovered, and there were no

signs of forced entry.  Similarly, Plaintiff's presence in the vicinity of the Property on

three separate occasions[13] prior to the fire is significant, since there is no evidence

concerning the precise time of origin of the fire.  Plaintiff's alleged admission to Lt.

Sadlier (which Detective Gray was entitled to credit) that he had been to the Property at

5:30 a.m. on March 5 is particularly incriminating, because it places Plaintiff at the

scene of the crime approximately one hour and fifteen minutes prior to the time the fire

was discovered.

    The two most significant pieces of exculpatory information, as set forth in the

corrected affidavit, involve the alleged motive of the Dominicans for committing the

arson and the fact that Mr. Marsh would have placed Plaintiff at his girlfriend's house at

6:50 a.m. on the morning of the fire.  However, this evidence, when weighed against the

_____

        [13] As we explained previously, Plaintiff denies ever having been at the Property at 5:30 a.m. on the
morning of the fire, and he further denies ever admitting to a 5:30 a.m. visit there.  However, the record
seems to be undisputed that Lt. Sadlier documented just such an admission by Plaintiff and there is
nothing in this record to suggest that Defendant Gray would have had grounds to discount the reliability of
that report.

incriminating evidence, does not negate probable cause.  As to the Dominicans' possible role in starting the fire, there is no basis from which a neutral magistrate reviewing the corrected affidavit could conclude that the Dominicans would have had access to the Property, as Plaintiff did.  While Crystal Porter claimed in her written statement of January 4, 2004 that an extra set of keys had come into the hands of the Dominicans, the record is undisputed that Detective Gray was not possessed of this information at the time he swore out his affidavits.

As for the fact that Gilbert Marsh would have placed Plaintiff outside his girlfriend's house at 6:50 a.m., approximately four minutes after the fire was reported, this fact is not necessarily conclusively exculpatory.  As we previously noted, the precise time of the fire's origin is not known or stated.  Furthermore, we can take judicial notice (as could a neutral magistrate) of the fact that Plaintiff's Property is located approximately 1-1.5 miles from the residence of Ms. Sparks, where Mr. Marsh allegedly observed Plaintiff at 6:50 a.m – a distance which, given the geography, can be covered by car in just a few minutes.  And, while Plaintiff claims to have remained at Ms. Sparks' house following their return from the hospital on the morning of March 5, even this alibi does not have to be accepted at face value.  As Plaintiff's girlfriend, Ms. Sparks' potential bias and motive to protect Plaintiff would be self-evident to a neutral magistrate and therefore does not necessarily vitiate probable cause.

In sum, then, we conclude that Detective Gray's affidavit establishes probable cause for Plaintiff's arrest even allowing for the corrections of the falsehoods arguably supported by the record.  Otherwise stated, the misstatements and omissions allegedly made by Detective Gray were not material to a finding of probable cause.

We reach a similar conclusion with regard to Detective Gray's search warrant affidavits.  In determining whether a search warrant application is supported by probable cause, we apply the totality of the circumstances analysis to determine whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Illinois v. Gates, 462 U.S. 213, 238 (1983).  Detective Gray's

search warrant affidavits, as amended, set forth the same basic facts which establish probable cause to believe Plaintiff set the fire at his Property.  In addition, the affidavits establish Plaintiff's admission that he owed money to the utility companies and was indebted by mortgages.  It therefore follows that there was a fair probability Detective Gray would find incriminating evidence in the credit and financial documents he sought to obtain.

### B.  Plaintiff's Equal Protection Claim

Plaintiff also claims that his rights under the Equal Protection Clause of the Fourteenth Amendment were violated under the theory that Detective Gray's actions in investigating and arresting Plaintiff were driven by racial animus.  In support of this claim, Plaintiff contends that Detective Gray neither possessed, nor reasonably could have believed that he possessed, probable cause for Plaintiff's arrest or the search of Plaintiff's financial records.  As evidence of racial animus, Plaintiff points to the following:

* While talking to Detective Gray on the day he was scheduled to take a polygraph examination,[14] Plaintiff identified Mr. Marsh as an individual who saw Plaintiff and his son getting into Plaintiff's truck shortly before Plaintiff reported to work on the morning of the fire. Upon hearing this information, Detective Gray allegedly looked at Plaintiff and remarked, "[W]hat, is he black too[?]"  (See Pl.'s Depo. [Doc. # 30-2] at p. 14.)

* Following the foregoing exchange, Detective Gray stated that he had a "surprise" for Plaintiff.  The record would permit an inference that the "surprise" Detective Gray was referring to was the fact that a black police officer would be administering the polygraph test. (Id. at 28-29.)

* Shortly after the fire, Plaintiff's father had allegedly remarked to Plaintiff that he believed the fire had been set by the Dominicans as an act of retaliation against Crystal.  Plaintiff claims that when he repeated this information to Detective Gray, Detective Gray responded, "[T]hat's what you all say."  (Id. at p. 28.)

---

[14] The record indicates that the scheduled polygraph examine was never actually administered.

Plaintiff claims that this evidence would permit an inference that Detective Gray was motivated by an intent to discriminate against Plaintiff because of his race.

To prevail on an equal protection claim in the racial profiling context, a plaintiff must show that the challenged law enforcement practice had a discriminatory effect and was motivated by a discriminatory purpose. Carrasca v. Pomeroy, 313 F.3d 828, 834 (3d Cir. 2002) (citing Bradley v. United States, 299 F.3d 197, 205 (3d Cir. 2002)). To prove discriminatory effect, Plaintiff must show that he is a member of a protected class and that he was treated differently from 'similarly situated' persons in an unprotected class. Id. (citing Bradley, 299 F.3d at 206). Although Plaintiff has produced evidence which arguably supports a finding of racial animus on the part of Detective Gray, there is no evidence to support a finding of discriminatory effect – i.e., that similarly situated persons outside of Plaintiff's protected class were treated differently. Accordingly, Plaintiff's § 1983 claim premised on an alleged violation of his equal protection rights cannot survive summary judgment.

### C. QUALIFIED IMMUNITY

Defendant has made the alternative argument that he is protected by qualified immunity. Under the doctrine of qualified immunity, law enforcement officers acting within their professional capacity are generally immune from trial "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Wilson v. Russo, 212 at 786 (quoting Wilson v. Layne, 526 U.S. 603 (1999)). Only if the plaintiff has alleged the deprivation of an actual constitutional right should we "proceed to determine whether that right was clearly established at the time of the alleged violation." Id. (citing Conn v. Gabbert, 526 U.S. 286 (1999)). A grant of summary judgment is appropriate if no reasonable juror could conclude that the plaintiff's clearly established rights were violated. Id. (citing Orsatti v. New Jersey State Police, supra, at 482). Practically speaking,

> We arrange the facts in the light most favorable to the plaintiff, and
> then determine whether, given precedent, those "facts," if true,
> would constitute a deprivation of a right.  And then, if necessary,
> we determine if the right is clearly established.

<u>Id</u>.  If the plaintiff fails to adduce facts from which a jury could conclude that his

constitutional rights were violated, then we need not engage in the second inquiry.  <u>Id</u>.

Because we have concluded that the record does not support a finding that Plaintiff's

rights were violated, under either the Fourth or Fourteenth Amendments, we need not

reach the issue of qualified immunity.

## IV.  CONCLUSION

Based upon the foregoing reasons, Defendant's motion for summary judgment

will be granted.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ALLIE L. PORTER, III,                    )
                                         )
                 Plaintiff,              )
                                         )       Civil Action No. 05-231 Erie
        v.                               )
                                         )
THOMAS E. GRAY,                          )
                                         )
                 Defendants.             )

## O R D E R

AND NOW, to wit, this 13th day of February, 2007, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Motion [Doc. # 22] for Summary Judgment filed by Defendant Thomas E. Gray is GRANTED.  JUDGMENT is hereby entered in favor of Defendant Thomas E. Gray and against Plaintiff Allie L. Porter, III.

                              s/    Sean J. McLaughlin
                                    SEAN J. McLAUGHLIN
                                    United States District Judge

cm:    All counsel of record.